**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,

     Plaintiff,

v.

LAVEIL D. MANSAW (01),

     Defendant.

Case No. 19-20062-01-DDC

## MEMORANDUM AND ORDER

     This matter comes before the court on defendant Laveil D. Mansaw's Motion to Suppress (Doc. 16). Mr. Mansaw contends that a police officer unlawfully stopped his car on February 15, 2019. His motion seeks to suppress all evidence seized as a result of that stop. The government has responded (Doc. 21). For reasons explained below, the court denies Mr. Mansaw's motion.

### I.    Background and Controlling Facts

     The court held an evidentiary hearing on February 28, 2020, and unless otherwise noted, makes the following factual findings from the evidence presented on that date:

     Around 9:24 a.m. on February 15, 2019, Officer Alex Gould prepared to leave the Bonner Springs Police Department[1] at 13001 Metropolitan Avenue, Bonner Springs, Kansas, to begin his daytime patrol shift. It was snowing. In bad weather, Bonner Springs's patrol officers concentrate on helping motorists and responding to calls. As Officer Gould prepared to leave the parking lot, he saw a car about a quarter of a mile away to his south. The car was stopped in the

---

[1] Bonner Springs is a Kansas city with about 7,700 residents. It is located in western Wyandotte County, Kansas, near the west edge of the Kansas City metropolitan area.

middle of Sheidley Avenue, and its headlights were lit.[2]  Sheidley Avenue is an unmarked, 30-mile-per-hour road, which runs north and south through a mostly residential area.  It is a hilly road with no sidewalks and, in the area germane to this case, no paved shoulders adjacent to the roadway.

Through the snow, Officer Gould could not discern the make or model of the car or anything about its occupants.  He decided to check on it.  He turned his marked patrol car right out of the police station parking lot and drove south on Sheidley Avenue toward the car.  As he approached, he could see the car slowly making progress north on Sheidley, but its tires were spinning.  As he neared the car, Officer Gould could identify the car as a white, older-model Buick.  But the car's windows were iced over and dark-tinted, so he still could not discern anything about the car's occupants, or even how many occupants were in it.  Officer Gould decided to drive past the car, turn around, and see if he could assist the driver.

Events unfolded quickly from there.  Officer Gould drove past the Buick and began a three-point turn using a residential driveway on Sheidley Avenue.  When Officer Gould pulled into the driveway, he saw the car begin backing, southbound, down Sheidley.  Officer Gould completed his three-point turn and began to pull up behind the Buick.  By that time, the Buick

---

[2]      Officer Gould testified that when he first saw the car, it was stopped in the middle of the road. Mr. Mansaw disputes this testimony.  Mr. Mansaw asserts that the car—which he was driving—was stopped in the northbound lane of traffic.  Later, video captured by Officer Gould's body camera shows Mr. Mansaw's car occupying the northbound lane, not in the middle of the road.  Mr. Mansaw also admitted an excerpt from Officer Gould's report into evidence.  It reports that Officer Gould "observed a white 1993 Buick Roadmaster bearing Kansas tag 704LPD stopped in the lane of traffic, facing northbound, in the approximate 700 block of Sheidley Avenue."  Def. Ex. 1.

To decide this motion, the court need not decide whether Mr. Mansaw's car was in the middle of the road or, instead, in the lane of traffic.  The court concludes, below, that Officer Gould had reasonable suspicion of illegal backing.  Whether Mr. Mansaw's car was in the middle of the road or in the northbound lane when Officer Gould first saw him does not influence the court's decision.

had stopped in the northbound lane of traffic.  Officer Gould decided to initiate a traffic stop for

illegal backing.  As Officer Gould's patrol car approached the Buick, he saw the Buick's reverse

and break lights turn off and then, the driver got out the Buick before the officer even could

place his patrol car in park.  The driver of the Buick began walking toward Officer Gould's car.

Officer Gould put his car in park, radioed his location to his dispatcher, and activated his body

camera.  The government admitted a CD containing the video captured by this camera as Exhibit

1.[3]

     Officer Gould started to step out of his patrol car as the driver approached him.  He told

the driver to stay where he was and motioned in the general direction of the Buick.  The driver

continued approaching Officer Gould.  At that point, Officer Gould reached back into his patrol

car and activated his emergency lights.  He did so, he testified, because he wanted to warn any

approaching traffic of the hazard and because he wanted to signal the Buick's driver that he was

not free to leave.  Then, Officer Gould informed the driver of the reason he had stopped him:

"The reason I stopped you was for illegal backing down the street."  At about the same time, a

passenger wearing a yellow hooded sweatshirt stepped out of the Buick's passenger door and

began walking away, *i.e.*, walking in the opposite direction of Officer Gould and his patrol car.

     Officer Gould got out of his car and met the driver—who had kept approaching Officer

Gould even after he was asked to stop approaching—in the space between the front of the patrol

car and the rear bumper of the Buick.  He told the driver to get back into his car, and that he

could smell the odor of marijuana on his person.  The driver did not return to his car.  Officer

Gould also directed the passenger to return and lean up against the Buick.  The officer believed

---

[3]     Officer Gould's body camera began recording both audio and video at this point in the encounter.
The body camera preserved the last 30 seconds of video footage (without audio) captured by the camera
before he pressed the "record" function.  It shows Officer Gould making his three-point turn using the
driveway on Sheidley Avenue.

the passenger was trying to distance himself from the scene.  Then, the driver began acting

nervously.  He volunteered information about where he lived and where he was going.  He then

motioned to a nearby house and said that he "stayed right there."  The driver sat down on the

ground next to the street and, after a few seconds, stood up again.  Concerned for his safety,

Officer Gould asked the driver to keep his hands out of pockets.  Then, the driver emptied the

contents of his pockets—including a cell phone—onto the ground, which was covered with

snow.  The driver volunteered to Officer Gould he had nothing illegal.  Officer Gould assured the

driver that he didn't need to empty his pockets.  Officer Gould again told him to "stay right here"

as the driver continued to take items out of his pockets.  He then directed the driver to lean up

against the patrol car.  Then, Officer Gould informed the driver again that he had stopped him for

illegally backing down the street, but now, he was making the officer "a little nervous."  Officer

Gould again said that he had smelled marijuana when the driver first approached him, that he had

been a cop a long time, and that marijuana was "not the crime of the century."  He encouraged

the driver to remain calm.

Then, Officer Gould asked for Mr. Mansaw's license and insurance information.  The

driver provided a license, which identified him as Laveil Mansaw, the defendant in this action.

Mr. Mansaw told Officer Gould that he had his insurance information on his phone.  He picked

up his phone and dropped his wallet on the ground.  By then, a second Bonner Springs police

officer had arrived on scene and began talking to Mr. Mansaw.  Officer Gould then asked the

passenger for his identification.  The passenger responded, saying he had no identification with

him but his name was Taurez Adams.  Officer Gould asked to search the pocket of Mr. Adams's

hooded sweatshirt to make sure he had no weapons.  Mr. Adams moved his hands away from his

pocket and, as Officer Gould checked it for weapons, he saw green, leafy vegetation on Mr.

Adams's sweatshirt.  Gesturing toward Mr. Adams's sweatshirt, the officer asked, "What's that little green piece?"  Mr. Adams then brushed the front of his sweatshirt.

Officer Gould then walked up alongside the driver's side of the Buick.  He smelled a strong odor of marijuana coming from the car.  Officer Gould provided Mr. Mansaw's information to his dispatcher and asked her to check it.  Then, the officer approached the driver's side of the Buick again as he waited for the dispatcher to reply.  Looking through a rolled-up window, he saw a loaded magazine for a handgun resting on the center console.  Officer Gould used his radio to communicate "Signal 1, magazine in the center console" to the other officer on scene.

Officer Gould told Mr. Adams he was going to pat him down because he could see an ammunition magazine for a handgun in the Buick.  He also told Mr. Adams that he was not under arrest and that he only was checking him for weapons.  The other officer on scene likewise conducted a pat-down of Mr. Mansaw.  As a third officer arrived on scene, the return came back from the dispatcher about Mr. Mansaw.  She advised that Mr. Mansaw had an expired driver's license and currently was on federal probation.  Officer Gould then asked the dispatcher to run Mr. Adams's name.

At this point, Officer Gould walked over to Mr. Mansaw and told him he could smell marijuana coming from the car.  Mr. Mansaw tried to show Officer Gould his insurance information on his phone.  Officer Gould said that he had seen green vegetation on the passenger's sweatshirt, and he had probable cause to search the car for marijuana.  Also, Officer Gould told Mr. Mansaw his driver's license had expired.  Mr. Mansaw reached into his wallet— by then, it was resting on the hood of the patrol car—and, it appears, searched for a different driver's license or some other form of identification.  Officer Gould then walked to the Buick,

opened the driver's side door, and began searching the car.  He found 40 pills in a brown pill

bottle in the center console.  Based on his experience, Officer Gould recognized the pills and

suspected they were Ecstasy.  He directed the other officers to take Mr. Mansaw and Mr. Adams

into custody.  They handcuffed the two men and secured them inside the patrol cars.[4]

The officers then continued to search the Buick.  The government contends they found

several other items inside it:  (1) a loaded black 9mm Taurus pistol under the right side of the

driver's seat; (2) a loaded 9mm firearm magazine in the center console; (3) a partial box of .45

caliber ammunition wedged between the center armrest and the front passenger seat; (4) a white

vacuum-sealed canister with a black plastic bag containing several bags of marijuana

(approximately 110 grams); (5) a blue plastic bag containing 112 grams of synthetic marijuana;

(6) a digital scale; (7) a loaded firearm magazine; and (8) loose miscellaneous ammunition (.30,

.357, and .45 caliber).  Doc. 21 at 8–9.  Officers took Mr. Mansaw and Mr. Adams to the

Wyandotte County Detention Center, where, the United States contends, they found a plastic bag

containing marijuana hidden in the groin area of Mr. Adams's pants.  *Id.* at 9.  The grand jury

indicted Mr. Mansaw, charging him, among other things, with possessing marijuana with intent

to distribute it, possessing a firearm in furtherance of a drug trafficking crime, and possessing a

firearm though prohibited by law from doing so.

The government's Response also asserts that a police officer interviewed Mr. Mansaw

and, post-*Miranda*, he conceded that the items allegedly seized from the car belonged to him—

including the marijuana, the ecstasy pills, and the firearm.  Doc. 21 at 9.  In the interview,

---

[4]      Officer Gould testified to the facts up to this point of the encounter with Mr. Mansaw.  But since
the parties confine their current dispute to the reasonableness of the initial traffic stop, Officer Gould did
not testify about the evidence the officers claim they seized from the car.  The court takes those
allegations from the government's brief and it includes them purely for context.  They are not material to
the issues here.

according to the government, Mr. Mansaw also admitted that he had difficulty driving his car in the snow, that he had backed it down the street, and that he was stopped in the lane of traffic when Officer Gould stopped behind his car and activated his car's emergency lights.  *Id.*

## II.   Request to Suppress Evidence

Mr. Mansaw now asks the court to suppress all evidence acquired during the search of his car and all evidence derived from it, arguing that Officer Gould's action was unjustified at its inception and thus violated his Fourth Amendment rights.

### A.   Fourth Amendment Standard and Burden Imposed by Governing Law

The Fourth Amendment[5] to the United States Constitution forbids unreasonable searches and seizures.  *California v. Carney*, 471 U.S. 386, 390 (1985).  A traffic stop is a "seizure," as the Fourth Amendment uses that term, "even though the purpose of the stop is limited and the resulting detention quite brief."  *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  But routine traffic stops are "more analogous to an investigative detention than a custodial arrest."  *Id.*  (citing *United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995)).

As a result, the courts "analyze such stops under the principles developed for investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968)."  *Id.*; *see also United States v. Botero-Ospina*, 71 F.3d 783, 785 (10th Cir. 1995) (en banc).  When evaluating the reasonableness of an investigative detention, courts must "make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first

---

[5]     "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

place.'" *Hunnicutt*, 135 F.3d at 1348 (quoting *Terry*, 392 U.S. at 20).  Here, the motion to suppress focuses on the first inquiry because Mr. Mansaw contends the police lacked justification at the inception of the traffic stop.

The government contends Officer Gould had sufficient reasons to stop the Buick.  To justify a traffic stop for a suspected violation of law, "an officer needs 'only reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law.'" *United States v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)); *see also Botero-Ospina*, 71 F.3d at 787 (traffic stop valid under the Fourth Amendment if it "is based on an observed traffic violation or if the officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring").  When a defendant challenges the reasonableness of a traffic stop, "the government bears the burden of proving the reasonableness of a traffic stop . . . ." *Vance*, 893 F.3d at 773, n.9 (citing *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017)).  In contrast, the Circuit "repeatedly [has] held that 'the ultimate burden is on the defendant to prove that the challenged seizure was illegal under the Fourth Amendment.'" *Id.* (quoting *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999)).  The Tenth Circuit has recognized "these two competing lines of precedent" but has declined to "reconcile" them at least once.  *Id.*

If a court determines a search or seizure violated the Constitution, the exclusionary rule, subject to a good faith exception that doesn't apply here, prohibits the court from admitting the fruits of all evidence seized illegally.  *See Wong Sun v. United States*, 371 U.S. 471, 485–88 (1963).  The good faith exception applies, for example, when a law enforcement officer relies in good faith on a warrant later determined to be technically defective.  *United States v. Leon*, 468

U.S. 897, 905 (1984).  It isn't germane here because Officer Gould conducted a warrantless search.

### B.    Analysis

#### 1.  Initial Encounter:  Public Safety

Mr. Mansaw's motion challenges the validity of the initial traffic stop.  The court begins by recognizing that there is something of a disconnect between the terminology used by the parties' arguments and the facts of this case.  This isn't the parties' fault.  Instead, the disconnect inheres in the way the cases commonly describe an encounter between a driver and a police officer over a putative traffic infraction.  They call it an investigative stop, or a traffic stop.  *See, e.g.*, *Navarette v. California*, 572 U.S. 393, 396 (2014).  In a typical traffic case, the encounter begins with the police officer signaling the driver to pull over and stop.  In contrast, here, from the time Officer Gould first saw Mr. Mansaw's car until he parked it, the car either was stopped or nearly stopped.  Slippery road conditions had stopped Mr. Mansaw's Buick before the officer even reached his location.  Nonetheless, the court uses the traffic stop terminology to address this situation because it best captures the gravamen of the challenge presented by defendant's motion.

Mr. Mansaw asserts that Officer Gould lacked reasonable, articulable suspicion that a traffic violation had occurred.  Doc. 16 at 4.  Thus, he contends, the search that followed the stop and ultimately produced the evidence was secured unlawfully, so the court must suppress the "fruits of [that] poisonous tree."  *Id.* (citing *Wong-Sun*, 371 U.S. at 487–88).  The government views the first two phases of this encounter quite differently.

It asserts that Officer Gould, at first, was performing a public safety function when he approached the Buick.  The evidence substantiated this view.  From what Officer Gould could see through the falling snow, the car was stalled on Sheidley Avenue and its tires were spinning.

The officer credibly testified that he decided to turn his patrol car in the Buick's direction because he thought the driver might need assistance.  This mission qualifies as a public safety function.  In a circumstance like the one Officer Gould encountered last February, an officer properly can conduct a public safety stop without suspecting the driver has committed a traffic violation.  *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).[6]

Mr. Mansaw attacks the public safety argument, noting that Officer Gould's written report about the interaction says nothing about public safety or aiding a motorist.  Instead, Officer Gould's written report asserted that he drove to Mr. Mansaw's car to "investigate."  Def. Ex. 1.  This language, defendant argues, tacitly recognizes that Officer Gould never engaged in a public safety mission and, from the beginning, he drove to Mr. Mansaw's car to "investigate" what he illegally viewed as suspicious circumstances.

While Mr. Mansaw is correct about the contents of Officer Gould's report, he misapprehends the governing principles that matter.  When considering the justification for a stop, "the subjective motivations of an arresting officer are irrelevant."  *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001); *see also United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996) (holding that officer's subjective intentions or state of mind are irrelevant to Fourth Amendment analysis).  The court agrees with the government—Officer Gould didn't need reasonable suspicion of a traffic violation to approach Mr. Mansaw's car in the first instance.  Specific, articulable facts, *i.e.*, Mr. Mansaw's car was stopped on a slick

---

[6]     Kansas state law is similar.  A "civil or criminal infraction is not always essential to justify a vehicle stop.  Safety reasons alone may justify the stop, *if the safety reasons are based upon specific and articulable facts*."  *State v. Vistuba*, 840 P.2d 511, 514 (Kan. 1992), *overruled on other grounds by State v. Field*, 847 P.2d 1280 (Kan. 1993); *see also Nickelson v. Kan. Dep't of Revenue*, 102 P.3d 490, 494–95 (Kan. Ct. App. 2004) (holding that welfare check on vehicle pulled to side of highway qualified as lawful public safety stop).

roadway in inclement weather, justified a public safety encounter.  *See King*, 990 F.2d at 1561

(holding that defendant honking at accident site created a specific, articulable basis for officer to

approach car for public safety reasons).

And even if Officer Gould's motivations mattered, the court isn't persuaded by

defendant's effort to discredit Officer Gould's testimony that he decided to drive to the Buick for

safety reasons.  For one thing, the report's use of the word "investigate" doesn't discredit the

idea that Officer Gould, at first, had a public safety mission in mind.  In context, the verb

"investigate" refers to Officer Gould's decision to drive his patrol car to the Buick to discern

whether—as it appeared from a distance—its driver was marooned because of slick roads.  Using

the word "investigate" doesn't contradict the idea that Officer Gould first approached for public

safety concerns.  Also, that the report omits an explicit reference to a public safety mission isn't

a significant omission.  Given the more legally significant events that followed, the court

understands why Officer Gould didn't bother to memorialize his original safety mission in his

report.

## 2.    The Ensuing Consensual Encounter

Once Officer Gould reached the Buick but before he even had parked it, Mr. Mansaw got

out of his car and began approaching Officer Gould.  The government contends that the

defendant, by this conduct, initiated a consensual encounter.  Doc. 21 at 10.

"A consensual encounter is not a seizure for purposes of the Fourth Amendment."

*United States v. Spence*, 397 F.3d 1280, 1282 (10th Cir. 2005); *see also Hernandez*, 847 F.3d at

1263 (holding that Fourth Amendment does not proscribe all contact between police and citizens,

and law enforcement officers don't violate the Fourth Amendment merely by approaching an

individual on the street and asking him questions).  Whether an encounter is consensual depends

on whether a reasonable person, under the circumstances, would believe he was not free to leave.
*United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir. 1990).

When courts decide whether an encounter truly was consensual, they consider several factors:  the location of the encounter; whether the officer touched or restrained the defendant; whether the officer displayed a weapon; and the officer's demeanor and tone of voice.  *Spence*, 397 F.3d at 1283. The court must consider the "totality of the circumstances surrounding [an] encounter" and "no single factor is determinative."  *United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir. 1999)

The court agrees with the government's position.  Officer Gould's first interaction with Mr. Mansaw was a consensual encounter.  Mr. Mansaw's Buick already was stopped on the road when Officer Gould pulled his patrol car up behind the Buick.  Just as Officer Gould pulled up and started to get out of his patrol car, Mr. Mansaw quickly stepped out of his car and began approaching the officer.  No evidence suggested that the officer prompted the defendant to leave his car and approach the police officer.  No one coerced the defendant to initiate that contact.  Mr. Mansaw made that decision to approach the officer.  At that early stage of the encounter, Officer Gould hadn't yet made any "show of authority" restraining Mr. Mansaw's liberty.  *Spence*, 397 F.3d at 1283.  A reasonable person in Mr. Mansaw's position would have believed he was free to leave or stay, as he wished.  This encounter, in its first few moments, was a consensual one.  *See United States v. Langston*, 970 F.2d 692, 709 n.3 (10th Cir. 1992) (holding encounter consensual where driver voluntarily stopped his car after police officer, driving alongside him, made eye contact with him); *see also United States v. Magee*, 816 F. Supp. 1511, 1516 (D. Kan. 1993) (holding encounter was consensual where troopers didn't signal for defendants to stop their car, didn't use their emergency lights or sirens, never commanded or

directed defendants to pull over, didn't block their path, and defendants voluntarily stopped their car).

### 3.  The Fourth Amendment Seizure

The nature of this encounter changed quickly, however.  *See Hernandez*, 847 F.3d at 1264 (explaining that the "nature of a police-citizen encounter can change . . . what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa" (citations and internal quotation marks omitted)).  When Officer Gould saw Mr. Mansaw get out of his car, he put his patrol car into park, communicated his location to his dispatcher, and activated his body camera.  The officer started to step out his car and told Mr. Mansaw to stay where he was, motioning in the direction of Mr. Mansaw's car.  Mr. Mansaw nonetheless continued to approach Officer Gould, who reached back into his patrol car and activated his emergency lights.  The government concedes, albeit indirectly, that this is when the encounter became a traffic stop qualifying as a seizure under the Fourth Amendment.  *See* Doc. 21 (Government's Response to motion) at 14–15 (arguing that traffic stop hadn't begun when Mr. Mansaw stepped out of his car but then arguing that "the stop" was justified at its inception).  But the government never precisely identifies *when* this encounter changed from a consensual encounter to a seizure.  In the context of this case's dynamic facts, deciding when the seizure began matters a great deal.  The court thus turns to that question now.

The Tenth Circuit has explained that "'[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of the citizen may [a court] conclude that a "seizure" has occurred.'"  *Hernandez*, 847 F.3d at 1263 (brackets in original).  The "crucial test" asks "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not

at liberty to ignore the police presence and go about his business." *Id.* (internal quotation marks and citation omitted).  By definition, this standard uses "an objective test." *United States v. Gaines*, 918 F.3d 793, 796 (10th Cir. 2019).

This differentiation between a seizure and other forms of law enforcement interaction recognizes that police officers can interact with citizens and even "'make inquiries so long as they don't throw their official weight around unduly.'" *Hernandez*, 847 F.3d at 1264 (quoting *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990)).  No bright line defines when a law enforcement/citizen encounter crosses the line and becomes a seizure.  Instead, "'every case turns on the totality of the circumstances presented.'" *Id.* (quoting *Hill*, 199 F.3d at 1147) (further citation omitted).  The Circuit has identified, however, "a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police." *Id.*  These factors consider:

(1) the location of the encounter, "particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers;"

(2) whether the officers touch or physically restrain the defendant;

(3) whether the officers are uniformed or in plain clothes;

(4) whether the officers display weapons;

(5) the number, demeanor and tone of voice of the officers;

(6) whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and

(7) whether the officers specifically advised defendant at any time that he had the right to terminate the encounter or refuse the consent.

*Id.* (quoting *United States v. Lopez*, 443 F.3d 1280, 1284 (10th Cir. 2006)); *see also Werking*, 915 F.2d at 1408.  While "no single factor is dispositive, the 'strong presence of two or three

factors' may be sufficient to support the conclusion a seizure occurred." *Lopez*, 443 F.3d at

1284–85 (quoting *Fuerschbach v. SW Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006)).

Other factors may play a role in specific settings. For instance, "when police officers

pursue a citizen in their squad car while the citizen is on foot, courts will consider whether the

officers activated their siren or flashers, operated their car in an aggressive manor to block the

citizen's course or otherwise control the direction or speed of his movement, displayed their

weapons, or commanded the citizen to halt." *Hernandez*, 847 F.3d at 1264 (citing *Michigan v.

Chesternut*, 486 U.S. 567, 575 (1988)).

This case's emerging sequence of events presents a series of questions. Some are easier

to answer than others. The first question asks whether Mr. Mansaw was detained from the very

outset. The court already has answered this question with its findings that Officer Gould

approached Mr. Mansaw's Buick on a public safety mission and that the defendant, by leaving

his car to approach Officer Gould, initiated a consensual encounter. During these two phases of

the encounter, the police officers hadn't yet "throw[n] their official weight around unduly."

*Tavolacci*, 895 F.2d at 1425. A reasonable person would have felt free to ignore Officer Gould

and go on about his business. The question at the end of the counter is even easier. The police

officers placed Mr. Mansaw (and his passenger) in handcuffs and placed them inside their

marked police cars. Officer Gould explicitly informed Mr. Adams that he was detaining him.

Though it wasn't captured by Officer Gould's body camera or covered in his testimony, it's

rational to infer that one of the other officers on scene likewise informed Mr. Mansaw. Mr.

Mansaw surely was detained by this point.

But these two conclusions don't answer the controlling question. When, under the

circumstances, would a reasonable person have believed he was not free to leave? This question

matters so much because the court must decide whether—in the words of the Supreme Court—the defendant's detention was "'justified at its inception . . . .'" *Hunnicutt*, 135 F.3d at 1348 (quoting *Terry*, 392 U.S. at 20).

Applying the controlling factors from *Lopez* and *Werking*, the court finds that Officer Gould seized Mr. Mansaw when he lit the emergency flashers on his patrol car. According to the officer's testimony, this occurred 31 seconds into the video, at the "15:24:01Z" time stamp shown in the video's upper right corner. *See* Gov. Ex. 1 (video of Officer Gould's body camera).[7] Three of the *Lopez* factors lead the court to this finding:

### Factor (3) (whether the officers were uniformed or in plain clothes):

This factor considers—from the perspective of a reasonable person—the appearance of the scene where the detention allegedly occurred. Officer Gould was wearing his standard issue police uniform bearing the insignia of the Bonner Springs Police Department. He arrived in a car marked with the distinctive black and white livery of a patrol cruiser. While this factor favors the conclusion that the officers seized Mr. Mansaw at some point, it doesn't meaningfully inform the answer to the timing question. After all, a uniformed officer arriving in a marked patrol car still can engage in consensual encounters—as did Officer Gould here. All considered, this factor favors the court's finding that Officer Gould seized Mr. Mansaw when he activated his emergency lights, but only slightly.

### Factor (5) (the number, demeanor and tone of voice of the officers):

When Officer Gould activated his car's emergency lights, he was the lone officer on scene. Throughout his encounter with Mr. Mansaw, the officer's demeanor and tone communicated that he was in control of Mr. Mansaw's movement. In a professional but resolute

---

[7]     The officer's testimony explained that his video camera displays "Zulu time," some six hours ahead of CST in Bonner Springs.

tone, Officer Gould told Mr. Mansaw what to do and where to do it.  This tone emerged early in the encounter, even before the officer activated the flashers, when Officer Gould told Mr. Mansaw to return to his car.  But the officer displayed this demeanor more prominently after he had activated his emergency lights.  Also, Officer Gould stopped Mr. Adams from walking away from the scene.  He then instructed the passenger to return to the car he had shared with Mr. Mansaw.  On these facts, this factor favors the court's finding that the detention began when the officer activated his emergency lights.

> ### Factor (7) (whether the officers specifically advised defendant at any time that he had the right to terminate the encounter or refuse the consent):

No evidence suggests that any officer ever informed Mr. Mansaw that he had the right to terminate the encounter or refuse to follow the officer's instructions to him.  Again, this factor supports the court's finding that a detention began shortly after Officer Gould arrived.

The court's finding about the detention's timing also comports with the Supreme Court's analysis in *Chesternut*.  In *Chesternut*, the Supreme Court identified some additional factors that apply to the detention analysis when a citizen is on foot.  486 U.S. at 575.  Those factors merit consideration here even though Mr. Mansaw and his passenger arrived at the scene in a car. They apply because as the officer pulled up behind the defendant's car, both men got out of the Buick and were on their feet.  They became pedestrians, albeit in a limited sense.  Mr. Mansaw started walking back toward the police car.  The passenger started walking in the opposite direction.  Within a few seconds of the two men leaving their car, Officer Gould activated the flashing lights.  A reasonable person, seeing a police officer pull up behind his car and stop, might feel free to leave.  But if one adds the additional fact that the officer reaches back into his patrol car and activates its flashing red lights—which is what happened here—a reasonable

person would not feel free to leave.  This sequence of events favors the court's finding that Mr. Mansaw was seized when Officer Gould activated his car's emergency flashers.  *See Brendlin v. California*, 551 U.S. 249, 260 (2007) (holding all of car's occupants seized by officer's "successful display of authority" in using flashing lights to make traffic stop); *United States v. Silcott*, 377 F. Supp. 3d 1272, 1277 (D. Kan. 2019) (finding reasonable person "would not have felt free to leave or to disregard the officer's flashing lights").[8]

Finally, and though this decision isn't controlled by anyone's subjective intent, the court notes that its finding parallels Officer Gould's judgment.  Asked at the hearing why he had lit his patrol car's emergency lights, the officer testified that he wanted to warn approaching cars of the traffic hazard and signal the Buick's driver that he was not free to leave.

In sum, applying an objective test and considering the totality of the circumstances, the court finds that Officer Gould detained Mr. Mansaw when he activated his car's emergency lights.  This act communicated that Mr. Mansaw was not at liberty to leave and go about his business.  According to the officer's testimony, he lit his emergency lights at the 15:23:01Z mark of the body camera video introduced as Gov. Ex. 1.

### 4.  Did Officer Gould have reasonable suspicion when he activated his police car's emergency lights?

With its finding deciding when the detention began, the court next considers whether Officer Gould's seizure of Mr. Mansaw was "justified at its inception."  *Hunnicutt*, 135 F.3d at

---

[8]     The court's decision about the timing of Mr. Mansaw's detention is a consequential one.  Several incriminating facts emerged quickly after Officer Gould lit his emergency flashers.  The government asserts that Officer Gould smelled marijuana "almost immediately" when he first conversed with Mr. Mansaw, *see* Doc. 21 (Government's Response) at 14, and the officer's testimony corroborated this assertion.  The defendant's passenger acted in a fashion suggesting he was trying to distance himself from the Buick and whatever was in it.  But these events came after Officer Gould's decision to detain the defendant.  They thus can't contribute to the reasonableness of the detention decision he already had made.

1348 (holding traffic stop analogous to an investigative detention and asking "'whether the officer's action was justified at its inception'") (quoting *Terry*, 392 U.S. at 20). Here, the government tries to justify the officer's investigative detention by arguing that Officer Gould had probable cause or, at the very least, reasonable suspicion to believe that Mr. Mansaw had committed two traffic violations. *See* Doc. 21 (Government's Response) at 14. This theory is well-grounded in the Fourth Amendment cases.

An investigative detention "can only be justified if the officer[] had specific and articulatable facts and rational inferences drawn from those facts giving rise to a reasonable suspicion that [the defendant] was involved in criminal activity." *Hernandez*, 847 F.3d at 1268. Because this kind of detention is "less intrusive than an arrest, the suspicion required to make such a stop is less demanding than what is required for an arrest." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

What qualifies as reasonable suspicion? An officer who sees a driver commit a traffic violation has reasonable suspicion. *Hunnicutt*, 135 F.3d at 1348 (citing *Botero-Ospina*, 71 F.3d at 785). The same is true for an officer who observes an equipment violation. *Botero-Ospina*, 71 F.3d at 787. In contrast, "'inarticulate hunches'" can't carry the day. *Prouse*, 440 U.S. at 661 (quoting *Terry*, 392 U.S. at 22). Instead, an officer must possess "at least some minimal level of objective justification for making" a traffic stop. *Hernandez*, 847 F.3d at 1268 (internal quotation marks and citation omitted). Finally, and while it is "the government's burden to prove the reasonableness of the officer's suspicion," *id.* (citing *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)), the "level of suspicion" required is "considerably less than proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7. In other words, it isn't essential that the officer's suspicion of a violation proves to be correct. *Hunnicutt*,

135 F.3d at 1348 ("Our cases make clear that the government need not show a violation actually occurred to justify an initial traffic stop").  Yet again, the determination whether an officer had reasonable suspicion does not rest "'upon any one factor, but on the totality of the circumstances.'"  *Hernandez*, 847 F.3d at 1268 (quoting *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997)).

Here, the government asserts that Officer Gould reasonably suspected Mr. Mansaw of committing two different traffic violations.  The court address the two violations, below.

### a.  Illegal parking

The first traffic violation asserted by the government claims that Officer Gould reasonably suspected the defendant had parked his Buick illegally.  *See* Doc. 21 (Government's Response) at 15.  The government asserts that "[t]he defendant seems to acknowledge that the vehicle he was driving was initially parked illegally . . . ."  *Id.* (citing Doc. 16 (defendant's Motion to Suppress) at ¶1).  This assertion is both the beginning and end of the government's illegal parking argument.

The government's written response to Mr. Mansaw's motion never identifies any statute, ordinance, or other parking law that defendant supposedly violated.  Officer Gould's testimony was similar.  He never was asked to identify such a parking law.  Indeed, the officer wasn't even asked the most basic question:  Did he suspect the Buick was parked illegally?  The closest the government came was a question that asked Officer Gould's opinion whether it was unusual to see a car parked on Sheidley Avenue.  This isn't nearly enough.

The government hasn't provided the "minimal level of objective justification" required to support a reasonable suspicion of illegal parking.  *Hernandez*, 847 F.3d at 1268 (internal quotation marks and citation omitted).  As the Supreme Court has explained, "inarticulate

hunches" can't provide a basis for a finding of reasonable suspicion.  *Prouse*, 440 U.S. at 661.  The Circuit has amplified this requirement, mandating "some minimal level of objective justification."  *Hernandez*, 847 F.3d at 1268.  The government's parking argument falls way short of that standard.  It's just *ipse dixit* reasoning.  Given the government's wholesale failure to marshal any evidence on this front, the court finds that the police lacked reasonable suspicion to suspect Mr. Mansaw had parked his Buick illegally.[9]

### b.  Illegal backing

The government next asserts that Officer Gould reasonably suspected that the defendant illegally backed his car down Sheidley Avenue.  The traffic law at issue is Kan. Stat. Ann. § 8-1574(a).  This statute provides that "a driver of a vehicle shall not back the same unless such movement can be made with safety and without interfering with other traffic."  Kan. Stat. Ann. § 8-1574(a).

Mr. Mansaw disputes that Officer Gould had reason to suspect him of illegal backing.  He argues, first, that the government never provided any evidence that defendant drove his Buick in a way that interfered with traffic.  Second, he argues the government provided zero evidence that Mr. Mansaw backed his Buick unsafely.  Doc. 16 (defendant's Motion to Suppress) at 3–4.  He thus argues that the United States hasn't sustained its burden to show that the officer reasonably suspected defendant had violated § 8-1574(a).

---

[9]     In the video capturing the officer's interaction with Mr. Mansaw, Officer Gould never references illegal parking.  The court is mindful that this omission isn't fatal to the government's parking argument. *See United States v. Triska*, 574 F. Supp. 2d 1208, 1213 (D. Kan. 2008) (holding traffic stop valid for an alternative reason that the officer never articulated); *United States v. Pouncil*, No. 18-40006-02-HLT, 2018 WL 4749363, at *2 (D. Kan. Oct. 2, 2018) (Lungstrum, J.) (citing *Callarman*, 273 F.3d at 1286, and applying objective standard to conclude "the troopers need not actually have relied on the violation in stopping defendants").

The parties cited no Kansas case—state or federal—describing the kind of conduct that violates § 8-1574(a).  The court couldn't locate such a case either.  This dearth of authority complicates the analysis because, often, identifying the conduct that violates a traffic law informs the decision whether a detaining officer reasonably suspected his detainee of committing that violation.  *See, e.g.*, *Pouncil*, 2018 WL 4749363, at *1 (relying on Kansas Supreme Court's interpretation of Kansas traffic statute as threshold for deciding reasonableness of detaining trooper's suspicion).  Finding no Kansas authority, the court broadened its research to search for other states' application of similar illegal backing laws.

Georgia has adopted a substantially similar law.  *Compare* Ga. Code Ann. § 40-6-240(a) ("A driver shall not back a vehicle unless such movement can be made with safety and without interfering with other traffic.") *with* Kan. Stat. Ann. § 8-1574(a) ("The driver of a vehicle shall not back the same unless such movement can be made with safety and without interfering with other traffic.").  Applying that similar Georgia law, the Georgia Court of Appeals concluded that a law enforcement officer reasonably suspected a driver of illegal backing because he drove in reverse "ten to fifteen yards" uphill on a one-way street near a DUI checkpoint.  *Jones v. State*, 578 S.E. 2d 165, 166–67 (Ga. Ct. App. 2003).  The detaining officer testified that "he thought [defendant] was backing up his car in an unsafe manner, which *is* illegal."  *Id.* at 167.  The Georgia appellate court thus affirmed the trial court's decision denying the driver's motion to suppress.

To say the least, the conduct at issue in *Jones* isn't identical to Mr. Mansaw's conduct here.  Still, it provides some limited context for evaluating the reasonableness of Officer Gould's suspicion that Mr. Mansaw had violated the substantially similar Kansas statute.  And other

applications of similar illegal backing laws involved conduct even less similar to Mr. Mansaw's facts. The court does not find them helpful.[10]

Given this meager guidance about the offense of illegal backing, the court has reviewed the Officer Gould's testimony carefully. The officer's observations of defendant's car fall into three categories. In the first one, Officer Gould describes the Buick as "stationary." This description applies to what the officer saw from the police department's parking lot while the Buick was about one quarter of a mile away on Sheidley Avenue. It also applies to the Buick's status as Officer Gould drove past it, traveling in the opposite lane on his way to make a three-point turn. The officer's second category of observations consists of what Officer Gould saw as he neared Mr. Mansaw's car. The officer saw that defendant's car "actually was making slow progress north on Sheidley Avenue"—the direction the Buick was facing—but was spinning its tires. None of these observations can supply Officer Gould with reasonable suspicion of illegal backing for the most basic reason of all: the car wasn't going backwards.

But the officer witnessed a third kind of movement and the court finds it provided him with the requisite suspicion. After Officer Gould drove past the Buick and turned around, the Buick stopped, its reverse lights came on, and it started backing down the roadway. Officer Gould testified that, in his judgment, the Buick posed a traffic hazard when the defendant operated it in this fashion. The video corroborates that a car passed the Buick while it was backing. *See* Gov. Ex. 1 (officer's body camera video at 15:23:40Z; ten seconds into the video).

---

[10]    *See, e.g.*, *Berlanga Salgado v. State*, No. 13-17-00681, 2019 WL 1187019, at *2 (Tex. Ct. App. Mar. 14, 2019) (affirming finding that officer had reasonable suspicion defendant had violated Texas's similar illegal backing law where officer had to stop his car to avoid hitting defendant's car, moving in reverse); *State v. Santmire*, No. 02AP-517, 2002 WL 31752188, at *2 (Ohio Ct. App. 2002) (reversing trial court's decision to deny suppression motion because officer lacked reasonable suspicion defendant had violated Ohio's illegal backing statute where defendant backed up 20 to 30 feet, changed from left turn lane to through lane, and "caused no accident [and] did not hit or come close to hitting any other vehicle").

The video also shows the Buick's back-up lights still were lit when the other car passed the Buick.  The officer testified consistent with the contents of the video.  He explained that he saw Mr. Mansaw's car backing as he made the three-point turn.  This concerned Officer Gould because, in his opinion, it posed a traffic hazard on a two-lane roadway, covered with snow, with no shoulder for the converging car to use.  The officer explained that once he saw this series of events, he decided he was going to initiate a stop for illegal backing and then investigate, and "see what's going on with" the driver.

The court found the officer's testimony on this point credible and concludes that it provided "a particularized and objective basis" for suspecting that the driver—Mr. Mansaw— had committed a traffic violation.  While the government's evidence didn't supply overwhelming evidence to justify Officer Gould's suspicion about illegal backing, the governing law doesn't require that.  Officer Gould's testimony provided "some minimal level of objective justification" for the traffic stop he initiated.  *Hernandez*, 847 F.3d at 1268 (internal quotation marks and citations omitted).  The officer's explanation provided more than "inarticulate hunches" that, of course, won't do.  *Prouse*, 440 U.S. at 661.

The controlling case law "does not specify a minimum of factors necessary to constitute reasonable suspicion."  *United States v. Gutierrez-Daniez*, 131 F.3d 939, 942 (10th Cir. 1997). Instead, the court must evaluate the officer's conduct "'in light of common sense and ordinary human experience,' deferring to 'the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'"  *United States v. Stephenson*, 452 F.3d 1173, 1176 (10th Cir. 2006) (quoting *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996)).  And, the court is mindful that the required level of suspicion "'is considerably less than proof of wrongdoing.'"  *Gutierrez-Daniez*, 131 F.3d at 942 (quoting *Sokolow*, 490 U.S. at 7).

24

Though the evidence presents a relatively close question, the court finds that the government has carried its burden to show that Officer Gould developed reasonable suspicion of a traffic violation when his investigative detention of Mr. Mansaw began. *United States v. Berg*, No. 18-3250, 2020 WL 1870417, at *5 (10th Cir. Apr. 15, 2020).  The officer's suspicion justified his detention of Mr. Mansaw.

### C.  Conclusion

Because the law enforcement officer's investigative detention was justified at its inception, the court denies the defendant's motion.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion to Suppress (Doc. 16) is denied.

**IT IS SO ORDERED.**

**Dated this 20th day of April, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**